[No. 670-2. Division Two. July 20, 1972.]

GERTRUDE HOOD, *Individually and as Administratrix, et al., Appellants,* v. LYNETTE M. WILLIAMSON, *as Administratrix, Respondent.*

*Marshall D. Adams* (of *Muscek, Adams, Baker & Rohrs*), for appellants.

*F. V. Betts* (of *Skeel, McKelvy, Henke, Evenson & Betts*), for respondent.

ARMSTRONG, J.—Thomas C. Hood and Douglas W. Williamson were killed in a head-on automobile collision. The widow, minor son and estate of Mr. Hood commenced a wrongful death action against the administratrix of the estate of Mr. Williamson. Mrs. Williamson as administratrix and guardian of the minor children of Mr. Williamson cross-complained against the estate of Mr. Hood. Each party raised a defense of contributory negligence. The jury held in favor of defendant on plaintiffs' complaint but denied a recovery to defendant on the cross complaint. Plaintiffs appeal from the jury verdict in favor of defendant. Defendant does not appeal.

The primary issue on appeal centers upon whether the trial court should have instructed the jury upon a presumption that one who drives his vehicle on the wrong side of the road has the burden of justifying his driving on that side. The trial court refused to submit such an instruction. We agree.

The evidence clearly establishes that at approximately 10:50 p.m. on March 15, 1969 both of the decedents were killed in a 2-car head-on collision on primary state Highway 18, also known as the Echo Lake Cutoff, on the overpass crossing state Highway 181. Each decedent was alone in his vehicle. Hood, proceeding westbound, overtook the westbound vehicle of Lloyd Thacker prior to reaching the point of collision. Thacker saw the two cars come together in a head-on collision but was unable to tell the jury which side of the center line the oncoming cars were occupying at the time of the collision.

As Hood passed Thacker the witness noticed that the driver was not in a normal position. He was slumped or hunched over the wheel. The driver's chest appeared to be against the wheel. The witness was driving 25 to 30 miles per hour when Hood passed him. The witness was in the process of slowing down before going on to the off ramp. His "turn signals were on quite a ways up." He was in a position to see the road in front of him as well as the path of the Hood car that passed him. The Hood vehicle was in the oncoming lane of traffic when it passed the witness but thereafter the witness did not know whether the Hood car returned to the right-hand lane of traffic.

The evidence and inferences from the evidence most favorable to the decedent Hood would permit the jury to find the following facts. The blood alcohol reading of both decedents was in excess of 0.20 milligrams per cent. Lay witnesses presented uncontradicted testimony that decedent Hood attended a union meeting in Auburn between 7:30 and 10:30 p.m. They said he was sober throughout the meeting and gave a sensible report at the union meeting. At the end of the meeting, at approximately 10:15 p.m., the decedent had a sandwich and a small bottle of beer. His death occurred in a matter of minutes after he left the meeting.

Dr. Charles P. Larson, on the basis of a hypothetical question, stated that the decedent Hood could not have had such a blood alcohol reading under the circumstances de-

scribed by the lay witnesses who attended the union meeting. He explained the reading on the basis of a tearing in the diaphragm separating the abdomen from the thoracic organs. Both cavities were filled with blood and the stomach went up into the chest. He stated that even a bottle of beer in the stomach, if mixed with blood, might produce a blood alcohol reading in excess of 0.20 milligrams per cent. The accuracy of the blood alcohol reading of decedent Williamson was not questioned; it established that he was under the influence of intoxicating liquor.

State Trooper John Miller testified that he located gouge marks and chip marks on the pavement 3 feet 2 inches on the westbound inside lane—the decedent Hood's lane. It was the trooper's opinion that the gouge marks established the point of impact on Hood's side of the center line.

Approaching the scene of the impact from the route taken by decedent Williamson, Trooper Miller found green paint on a guardrail which matched the green paint on decedent Williamson's truck. A picture shows a scrape line on the right-hand portion of the Williamson vehicle. The white paint scraped from the guardrail corresponded to the white marks on the scraping of the Williamson panel truck. The marks on the guardrail and the scraping of the truck are in proportion. The trooper found a tire skid mark leading away from the guardrail.

Looking at the inferences from the evidence from the viewpoint most favorable to the defendant Williamson we find the following inferences and facts established. The witness Thacker turned off Highway 18 onto an exit ramp about 1,250 feet east of the collision. This ramp ran almost parallel to Highway 18 for a distance and then turned slightly to the north. The ramp remained somewhat level while Highway 18 rose upward in elevation to the west so that the place of collision was higher than the exit ramp. For this reason Thacker could and did follow the course of the Hood car but was not able to see the exact location of that car in relation to the center line as it proceeded west-

erly. He could and did, however, observe that automobile right up to the point of collision.

The defendant disputes the plaintiffs' contention that the point of impact was 3 feet 2 inches on Hood's side of the center line. Trooper Miller testified that there was a gouge mark at that point and in his opinion the impact occurred in that area. Considering the evidence in the light most favorable to defendant Williamson, it could be argued that this does not definitely establish the position of the cars when they collided.

The place where Hood was overtaking the witness Thacker was controlled by a no-passing center line. The center lines were double parallel yellow lines with a broken white line between them, thus marking it a no-passing area. This started 80 feet east of the exit ramp and continued beyond or west of the place of collision. The witness Thacker testified that Hood was in the "wrong lane" when he passed him—obviously meaning that he was in the lane reserved for oncoming traffic.

It could be argued on behalf of the defendant that Williamson observed the oncoming Hood vehicle in the Williamson lane, endeavored to turn to the far right hand side of his lane to avoid Hood, struck the guardrail and was thus thrown out of control and into the path of the Hood vehicle. There was also a possible fact question as to whether both drivers were across the center line at the time of the collision.

Plaintiffs first assign error to the court's failure to give their instruction No. 13:

> You are instructed that the laws of the State of Washington provide, with certain exceptions which are immaterial here, a motor vehicle shall at all times be driven to the right of the center of the highway.
>
> If you find the truck of Decedent WILLIAMSON, at the time of the accident, was being driven, or skidded, across the center of said highway in violation of the foregoing provision of the law, then such conduct would constitute negligence, unless the defendant has been able to furnish evidence which explained to your satisfaction the Decedent WILLIAMSON's violation of said law of the road.

Plaintiffs' second assignment of error relates to the failure of the court to give instruction No. 14:

It is the law that the mere fact of driving a vehicle on the forbidden side of the road does not render a driver guilty of negligence as a matter of law. But if he collides with another vehicle while on the forbidden side of the center line, the presumption is against him and casts upon him the burden of justifying his driving on that side. Therefore, in this case, should you find no evidence justifying the decedent DOUGLAS W. WILLIAMSON being on the forbidden side of the center line at the time of the head on collision at issue, that presumption is not rebutted and your verdict must be for the plaintiffs.

Both of the instructions relate to the burden to explain why the decedent Williamson was on the wrong side of the road, if the jury should believe that he was. They do not relate to the burden imposed upon the decedent Hood. Neither of the instructions should have been given where they refer to only one of the parties, as there was evidence from which the jury could believe that the decedent Hood had in fact been on the wrong side of the road at or immediately prior to the time of the collision. To apply an instruction to only one of the parties where there is evidence which would make it applicable to either party would clearly constitute a comment on the evidence.

We could sustain the trial court's refusal to give the requested instructions on the basis that they were not substantially correct and could not be given without modification or correction. An instruction which is in part correct and in other particulars incorrect may be refused as a whole. *State v. Refsnes,* 14 Wn.2d 569, 128 P.2d 773 (1942). Because of the importance of the case we decline to decide it upon a technical rule of law and will determine the issue on the merits. We have set forth in the margin the instructions of the court which related to the statutes allegedly violated.[1]

---

[1] "COURT'S INSTRUCTION No. 7

"The statutes of the state of Washington require that all vehicles be driven on the right side of the road that is to the right of the line

Plaintiffs' proposed instructions No. 13 and 14 were both based upon the minority rule that proof of violation of a statute requiring a motor vehicle to be driven to the right of the center of the highway only made out a prima facie or presumptive case of negligence and therefore only shifted the burden of going forward with the evidence, but did not shift the burden of proof. This rule finds support in a number of Washington decisions. *Lee & Eastes v. Continental Carriers, Ltd.*, 44 Wn.2d 28, 265 P.2d 257 (1953); *Purdie v. Brunswick*, 20 Wn.2d 292, 146 P.2d 809 (1944).

 The majority rule, however, holds that violation of a statute constitutes negligence *per se* and not just presumptive evidence of negligence. The majority rule has been supported by an overwhelming number of Washington cases as well as a majority of the cases from other jurisdictions. *Daley v. Stephens*, 64 Wn.2d 806, 394 P.2d 801 (1964); *Ward v. Zeugner*, 64 Wn.2d 570, 392 P.2d 811 (1964); *Wood v. Chicago, M., St. P. & Pac. R.R.*, 45 Wn.2d 601, 277 P.2d 345, 283 P.2d 688 (1954); W. Prosser, Torts § 36 (4th ed. 1971); Restatement (Second) of Torts § 288 B (1965). The two rules are discussed in the comment on WPI 60.01. We agree with the trial court in following the majority rule. The jury was instructed on that rule as set forth in the first paragraph of WPI 60.01:

COURT'S INSTRUCTION No. 9
The violation, if you find any, of a statute is negligence as a matter of law. Such negligence has the same effect as any other act of negligence. Therefore, it will not render a party liable for damages or bar recovery on the part of a party claiming injury or damage unless you

dividing the regular lanes of travel, except under certain circumstances not relevant or pertinent to this case.
"COURT'S INSTRUCTION No. 8
"You are instructed that a statute of the State of Washington provides that:
"Where signs or markings are in place to define a no-passing zone . . . no driver shall at any time drive on the left side of the roadway within such no-passing zone or on the left side of the pavement striping designed to mark such no-passing zone throughout its length."

further find that it was a proximate cause of the claimed injury or damage.

■ The rule that violation of a positive statute constitutes negligence per se has not been applied with reckless indifference to actual fault. Such violation is not negligence when due to some cause beyond the violator's control, which reasonable prudence could not have guarded against. *Wood v. Chicago, M., St. P. & Pac. R.R., supra.* This rule is set forth in the second paragraph of 60.01. Adapting the second paragraph to the facts of this case we would recommend the following instruction in a similar case:

> While the violation of a statute is, generally speaking, negligence as a matter of law, such a violation will not render a party liable or bar recovery on the part of a party claiming damage if you find it is due to some cause beyond the violator's control, and which ordinary care could not have guarded against.

The most common instance where a violation of a statute has been held to be due to a cause beyond the violator's control, which reasonable prudence could not have guarded against, is where the violation is excused by an emergency. *Wood v. Chicago, M., St. P. & Pac. R.R., supra.* An emergency instruction is properly applied on behalf of the driver of a car on its own side of the road, when confronted with a car on the wrong side of the road. *Zenith Transport v. Bellingham Nat'l Bank,* 64 Wn.2d 967, 395 P.2d 498 (1964). There was substantial evidence to justify giving the emergency instruction on behalf of both plaintiff and defendant.

The second paragraph of WPI 60.01 was not proposed by the plaintiffs in this case. We believe that the plaintiffs were, however, enabled to present their theory of the case by virtue of the emergency instruction which the court gave as its instruction No. 13:

> A person who is suddenly confronted by an emergency through no negligence of his own and who is compelled to decide instantly how to avoid injury and who makes such a choice as a reasonably careful person placed in

such a position might make, is not negligent even though he does not make the wisest choice.

Judgment affirmed.

PETRIE, C.J., and PEARSON, J., concur.